# IN THE COURT OF APPEALS OF TENNESSEE
# AT NASHVILLE
June 28, 2012 Session

## UNA P. IRVIN v. ERNEST J. IRVIN, II

**An Appeal from the Circuit Court for Montgomery County**
**No. DV 09-0084      John H. Gasaway, III, Judge**

**No. M2011-02424-COA-R3-CV - Filed November 30, 2012**

This is the second appeal in this divorce case. During the parties' ten-year marriage, they had two children. The husband served in the military, stationed in several different places. Eventually the family moved to Tennessee, where the wife worked part-time and took care of the children while the husband was deployed. Just after the husband returned from his deployment, the wife filed a petition for divorce, and the husband filed a cross-petition. The parties reached an agreement on property issues, but no others. After a trial, the trial court entered a final decree, found the husband at fault for the demise of the marriage, and granted the wife a divorce. The final decree designated the wife as the children's primary residential parent, awarded the wife rehabilitative alimony, and divided the marital estate in accordance with the parties' agreement. The husband filed the first appeal. The appellate court dismissed the first appeal for lack of a final order and remanded the case for resolution of several issues. After a post-remand hearing, the trial court entered an order mostly reaffirming its initial decision. However, in light of the wife's post-remand admission of infidelity during the marriage, the trial court declared the parties to be divorced, rather than granting the wife a divorce. The husband again appeals, challenging the trial court's failure to find the wife at fault for the demise of the marriage, its designation of the wife as the children's primary residential parent, the award of rehabilitative alimony, the property division, and the award of attorney fees in favor of the wife. We modify the award of alimony, but otherwise affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is
Modified in Part, Affirmed as Modified, and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

Donald Capparella, Nashville, Tennessee, for the Defendant/Appellant Ernest J. Irvin, II[1]

Lawrence J. Kamm, Nashville, Tennessee, for the Plaintiff/Appellee Una P. Irvin[2]

## OPINION

### Background[3]

On December 28, 1999, Plaintiff/Appellee Una P. Irvin ("Wife") and Defendant/Appellant Ernest J. Irvin, II ("Husband") were married in Fayetteville, North Carolina. Two children were born to the marriage — a daughter, born in September 2001, and a son, born in November 2003. At the time of the first trial, Husband was 37 years old, and Wife was 33 years old. Wife graduated from East Carolina University in 2000 with a degree in family community services. Wife is a licensed real estate agent, but at the time of trial, she was not actively pursuing a career in real estate. Husband has a degree in science and economics. He is a Major in the United States Army and has over nineteen years' of military experience. During the parties' marriage, Husband was deployed many times, including five deployments to Iraq, two to Afghanistan, and one to Kosovo and Bosnia. During the time period in question, the family lived in Clarksville, Tennessee.

On January 21, 2009, after nine years of marriage, Wife filed a complaint for divorce in the Circuit Court of Montgomery County. On February 3, 2009, Husband filed his answer and a counter-complaint for divorce.

After the parties filed for divorce, they initially continued to live together in the marital residence in Clarksville. This did not last long. On February 19, 2009, Wife filed a motion seeking exclusive possession of the marital residence. On the same day, Wife filed her answer to Husband's counter-complaint for divorce, along with a sworn income and expense statement. Husband opposed Wife's motion for exclusive possession of the marital residence and also filed his own income and expense statement.

On February 26, 2009, the trial court conducted a hearing on Wife's motion for exclusive possession of the marital residence. After the hearing, the trial court filed an order awarding

---

[1]Husband's appellate counsel did not represent him in the trial court below.

[2]Wife's appellate counsel did not represent her in the trial court below.

[3]The background facts are taken from our opinion in the first appeal in this matter. *See Irvin v. Irvin*, No. M2010-01962-COA-R3-CV, 2011 WL 2436507 (Tenn. Ct. App. June 15, 2011).

Wife $2,500 per month in temporary spousal support.[4] Because the parties and their children were all still residing in the marital residence, the trial court saw no need for a temporary parenting plan at that time. It denied Wife's motion for exclusive possession of the marital residence, in light of the fact that no physical violence had occurred and the parties were occupying separate areas within the marital residence. The trial court found that the parties' arrangement, with Husband living in the finished basement, had "worked well." Husband was allocated one hour per day of uninterrupted time with the children.

After the trial court denied Wife's request for exclusive possession of the marital residence, Wife told her father, Jess Thompson, that she was afraid of Husband and was scared that he would "snap." As Husband had no history of violence toward Wife, her fears were apparently based on her perception that other military personnel were returning from deployment with "post-traumatic stress." Acting on Wife's concerns, on March 19, 2009, Wife's father Jess Thompson filed a Congressional Inquiry on Husband with the office of United States Senator Saxby Chambliss. The Inquiry asserted that Husband was "abusive to the point of perhaps killing [Wife] and/or his children." As a result of these allegations, on March 24, 2009, a military order was entered, presumptively removing Husband from the marital home, pending completion of an investigation. As a precautionary measure, a mandatory 72-hour no-contact military order was entered, and Husband's battalion commander escorted him from the marital home.

The ensuing military investigation determined that there was no basis for the charges in the Congressional Inquiry filed by Wife's father. The record contains no evidence that Husband suffers from post-traumatic stress disorder ("PTSD"), or that he has any tendency toward violence. Despite this, Husband's commander suggested that he not return to the marital home to prevent escalation of the parties' situation. Later, Husband was transferred by the Army to a new duty station in Alabama. Wife remained in the marital home in Clarksville.

On March 13, 2009, Husband filed a proposed permanent parenting plan with the trial court. Husband's proposed plan designated him as the children's primary residential parent. On March 31, 2009, Husband filed a motion asking the trial court to enjoin Wife from "continuing to make spurious allegations to the Husband's Chain of Command and/or Department of the Army." That same day, Husband filed a separate motion asking the trial court to adopt his proposed temporary parenting plan, *pendente lite*, based on Wife's misbehavior. Husband alleged that Wife had spoken ill of him in front of their children and that she did not facilitate Husband's relationship with the children.

---

[4]Although the hearing was held on February 26, 2009, the order was not entered until December 7, 2009. The record does not indicate the reason for the delay in entry of this order.

Wife opposed Husband's request for injunctive relief and specifically refuted Husband's allegations. On April 29, 2009, Wife filed her own proposed temporary parenting plan, in which she sought to be designated as the primary residential parent. She also alleged that Husband was controlling to the point of being abusive.

On May 11, 2009, Husband filed another motion, this one asking the trial court to allow him to have the minor children evaluated by an expert of Husband's choosing. Wife opposed this motion as well.

On May 29, 2009, the trial court conducted a hearing on the pending motions. On June 29, 2009, it entered an order denying Husband's motion to have the children evaluated by Husband's expert, and rejected his proposed temporary parenting plan. It did not expressly address Husband's request for injunctive relief. The trial court appointed Dr. Janie Berryman to independently evaluate the children, and it appointed a guardian ad litem for the children as well. The order designated Wife as the primary residential parent, *pendente lite*, and awarded Husband alternate residential parenting time. The June 29, 2009 order is sparse on findings of fact, but nevertheless stated:

> The Court has considered the relevant factors enumerated in [Tennessee Code Annotated §] 36-6-404 and finds, for the most part, that the parties are equally weighted with regard to these factors. The Mother, however, has been the primary caregiver for the minor children for the majority of their li[ves] as Father has chosen, through his employment, to be away from his children the majority of their li[ves]. Additionally, the children have resided here in Clarksville for five years and the Court finds that it is not in their best interest to relocate with father to the state of Alabama at this time. . . . The Court finds that the Father should have access to the children at all reasonable times for visitation prior to his relocation to Alabama.

On July 28, 2009, the parties engaged in mediation that was partially successful. The mediator's report, filed on July 31, 2009, indicated that the parties had reached a partial agreement as to the property settlement, but that they could not agree on a parenting plan. The parties filed a Memorandum of Understanding, or mediation agreement, and later a Stipulation on how their settlement should be implemented.[5]

---

[5]The Stipulation in the record had no date stamp, but the trial court referred to it having been "filed with the Court on September 14, 2009." For purposes of our analysis, we consider the Stipulation as "a valid part of the appellate record . . . ." *Irvin*, 2011 WL 2436507, at *6.

The trial on the issues of alimony, child support, and the parenting plan was conducted on September 23, 24, and 28, 2009. At the close of the proof, the trial court made some findings in a bench ruling. However, the final decree was not entered until May 27, 2010. Notably, the trial court's oral rulings at the conclusion of the trial were not incorporated by reference into this final decree. Meanwhile, much had occurred between the time the oral ruling was announced and the time the decree of divorce was entered.

On March 26, 2010, Husband filed a motion asking the trial court to enforce the parties' mediation agreement, and also to enter a written order from the September 2009 trial. Husband asserted that, despite the parties' agreement that Wife would receive the marital home and make the mortgage payments on it, she was 120 days in arrears in making those payments. He asked the trial court to compel Wife to comply with the mediation agreement and to make the mortgage payments, so as to avoid foreclosure on the home. Husband also contended that Wife was refusing to comply with the trial court's oral rulings, issued at the conclusion of the September 28, 2009 trial, particularly the rulings related to Husband's alternate residential parenting time with the children.

On March 30, 2010, Wife filed her response to Husband's motion, attaching a copy of the Stipulation filed after the parties' mediation. The Stipulation stated that Husband had agreed to pay Wife "$42,500.00 as her share of the remaining assets, of which $2,500 has been paid." In reply, Husband filed a transcript of the trial court's September 28, 2009 oral ruling. On April 5, 2010, the trial court held a hearing on Husband's motion, but did not resolve it. Instead, the trial court set the case for further hearing, on April 27, 2010, to resolve all outstanding issues.

On April 16, 2010, Husband filed a motion to clarify the record as to the Congressional Inquiry filed by Wife's father, asking the trial court to mark the Congressional Inquiry as "Exhibit A," because it was allegedly "considered and excluded by the court for reasons set forth in the transcript." Husband claimed in his motion: (1) "Counsel intended the Congressional Inquiry to be marked for identification purposes only for the record"; (2) "after the trial was over, Husband's counsel was given back the Congressional Inquiry by a courtroom officer"; (3) "Court had been adjourned"; and (4) "Counsel hereby requests that the Court mark the attached as an exhibit that the Court excluded from evidence."

On April 27, 2010, the trial court conducted the scheduled hearing to resolve all outstanding issues. At the conclusion of the hearing, the trial court explained its view of the September 2009 oral ruling. It noted that the parties had agreed that Husband would pay Wife the sum of $42,500 in cash by the end of September 2009 and observed that Husband had in fact not done so. Consequently, the trial court reiterated that Husband was required to pay Wife $42,500 in cash in accordance with their agreement, plus 10% interest accruing from

September 30, 2009. Addressing Husband's motion to clarify the record as to the Congressional Inquiry, the trial court granted Husband's motion from the bench and marked the Congressional Inquiry for identification purposes only. However, there is no written order in the appellate record adjudicating Husband's motion to clarify.

A new development occurred shortly after this hearing. After Husband had spent some parenting time with the parties' children and returned the children to Wife's home, Wife, representing herself and without assistance of counsel, went to the General Sessions Court of Montgomery County, Tennessee, and filed a new action against Husband. Wife gave no notice to either Husband or his counsel of the new General Sessions Court proceedings. Wife also failed to inform the General Sessions Court of the divorce proceedings that remained pending in the Circuit Court. At the time, the Circuit Court had not yet entered the final decree of divorce.

In the General Sessions pleadings she filed, Wife asserted that, during his most recent parenting time with the parties' children, Husband had choked the parties' six-year-old son. On the basis of this claim, Wife sought an order of protection against Husband, pursuant to Tennessee Code Annotated § 36-3-601, *et seq.* Based on Wife's allegations, on May 5, 2010, the General Sessions Court issued an order of protection against Husband, forbidding him from having any contact with either Wife or the parties' children. Meanwhile, under the Circuit Court's ruling in the divorce proceedings, Husband's summer residential parenting time was scheduled to begin shortly. Once Husband learned of the General Sessions order of protection, he filed a motion in the General Sessions Court asking for dismissal of the order.

At the hearing in the General Sessions Court on Husband's motion to dismiss, the General Sessions judge heard evidence that the physician who had examined the parties' son regarding Wife's allegation had observed "no visible marks" on the child. This physician opined that domestic abuse was not indicated. The local police department and the Tennessee Department of Children's Services were both notified of Wife's allegations; neither took any action. Wife testified at the General Sessions hearing. In addition to testifying on her original allegations, Wife's testimony included an additional allegation, namely, that Husband had had inappropriate physical contact with the parties' seven-year-old daughter.

Ultimately, the General Sessions judge held that Wife's allegations of child abuse and sexual abuse against Husband were unfounded. The General Sessions judge concluded that Wife had misled the General Sessions Court in order to obtain an order of protection against Husband, and that her actions were taken for the improper purpose of circumventing the Circuit Court's order awarding summer residential parenting time to Husband. Directing her

-6-

remarks at Wife, the General Sessions judge concluded: "I think this is clearly a case of you trying to use these children against your ex-husband." Based on this conclusion, the General Session judge dismissed the order of protection and assessed costs against Wife.

After the General Sessions Court dissolved the order of protection, but before the Circuit Court entered the final divorce decree, Husband filed an expedited motion in the Circuit Court, asking the trial court to enforce its order awarding him summer parenting time. Husband's motion cited Wife's actions in filing the General Sessions proceedings and obtaining an *ex parte* order of protection; Husband asserted that Wife filed the General Sessions action "for the improper purpose of circumventing this Court's recent final decree of divorce." In response, Wife filed a *pro se* pleading in which she attempted to explain the *ex parte* order of protection. In this response, Wife again recited her belief that Husband was suffering from PTSD. She asserted, without citing any proof, that Husband "will continue to hurt not only his children, [but also] myself given the chance," as well as "others around him."

On May 27, 2010, the trial court entered its written order from the September 2009 and April 27, 2010 hearings, including the parties' final decree of divorce. In relevant part, the order stated:

> [T]he Court finds as follows:
> 1. . . . [T]hat the Husband is guilty of inappropriate marital conduct and that in weighing his conduct against that alleged of the Wife, the Court finds that his conduct preceded and was more egregious and damaging to the marriage and therefore, the Husband's Petition for Divorce is dismissed and the Wife is awarded a divorce on the grounds of inappropriate marital conduct.
>
> 2. That the Court adopts and incorporates the Memorandum of Understanding entered into between the parties in mediation dated July 28, 2009 (exhibit A) into this Final Decree as resolving by agreement, many property issues between the parties.
>
> 3. That the Court considered the relative factors set out in T.C.A. 36-6-404 wherein the Court found that the majority of the factors listed weighed equally on the part of the Mother and Father with regard to determining a parenting plan, however, the Court finds that the Mother has been the primary caregiver for the minor children for the majority of their li[ves] and has exercised a greater responsibility for caring for the children's daily needs due to the Father's numerous and lengthy deployments through his military service. Further, the court finds that these children have lived in Clarksville, Tennessee

in a very stable and satisfactory environment for a significant period of their lives and that the Father will be moving at least one more time through his military service within a year of the date of the final decree. Considering all of the factors, the Court finds that the Wife, Una P. Irvin, should be the primary residential parent of the parties' minor chil[dren] . . . .

4. That the parenting plan submitted by the Wife took into account more realistically than the parenting plan submitted by the Husband the day-to-day activities, given the distance between the parties. While the Court realizes that there cannot be a parenting plan that pretends to give each of these parents meaningful time on a day-to-day basis, there has to be every effort made so that the Husband can have as much time with the children as possible. . . .

5. The Court orders that the Husband was to pay unto the Wife the sum of $42,500.00 in cash for her interest in the remaining assets of the marriage and for various and other sundry items stipulated between the parties and filed with the Court on September 14, 2009 and enumerated to the Court on April 27, 2010. This cash payment to the Wife was due and payable by the end of September, 2009. At that time, the Husband had paid $2,500.00. The remaining balance of $40,000.00 accrued interest at 10% per annum beginning October 1, 2009. The Husband paid an additional $5,000.00 on this judgment on January 27, 2010, for which he will be given credit on the full judgment, with interest, as of the date of that payment. The remaining balance will continue to accrue interest at 10% [per] annum until paid in full by the Husband. Additionally, the Husband will not be given credit against this judgment for any mortgage payments he made after September 28, 2009 and the remaining balance of $35,000.00 will continue to accrue interest at 10% per annum.

6. The Court finds that the Wife is economically disadvantaged as opposed to the Husband. The Court finds that the Wife wants to attend and complete a post graduate degree to better improve[] her earning capacity on the open labor market and the Court finds that this plan is appropriate. Considering the Income and Expense statements of both the Husband and the Wife, the cash available to the Wife upon this Court's ruling of $42,500.00 and the Wife's plan, the Court orders that the Husband shall pay rehabilitative alimony to the Wife in the amount of $500 per month, beginning November 1, 2009 and continuing on the first day of every month thereafter, for a period of 42 months.

. . .

9. That the Court approved the attorneys fees of the Wife's counsel as requested and awards a judgment to the Wife for [$]16,620.00 in attorneys fees for which execution may issue.

Thus, the trial court determined that Husband was at fault for the demise of the marriage and awarded the divorce to Wife based on Husband's inappropriate marital conduct. The order designated Wife as the children's primary residential parent, awarded Wife $500 per month in rehabilitative alimony for 42 months, and also awarded her $16,620 in attorney fees.

The parties' mediation agreement was attached to the trial court's order and incorporated into it by reference. Pertinent to this appeal, the mediation agreement addressed the marital residence, Husband's military retirement, and the parties' remaining retirement account:

1. The Wife shall receive all interest in the [marital residence], for which she will be financially responsible. She shall refinance the mortgage or sell the house within three years of the entry of the Final Decree of Divorce. As long as the Husband is responsible on the mortgage, he shall have access to the mortgage account, and if the mortgage becomes over sixty days in arrears, he may make the delinquent payments, conditioned on the house being immediately listed for sale, and that he will be reimbursed from the proceeds of the sale for any payments that he makes.

2. The Husband shall receive either the IRA or the Thrift Savings Plan ["TSP"] that is closest to the face balance of $36,000.00, as of the date of this agreement. This is to equalize equity in the marital residence.

3. The Wife will receive twenty-five percent of the Husband's military retirement pension, based on a Major (04) with twenty years of service at retirement. The Wife shall not receive any disability that does not offset retirement, such as combat related disability.

4. The remaining retirement account not used to offset equity in the house (IRA or TSP) shall be divided equally by Qualified Domestic Relations Order.

Paragraph five of the trial court's order refers to the Stipulation signed by the parties and filed with the court. The Stipulation states:

1. That the parties have previously agreed to divide the marital estate, pursuant to the Mediation Agreement;

2. In addition to receiving the marital home, two (2) vehicles, and the other items in the [M]ediation [A]greement, the parties further agree that the WIFE shall receive $42,500.00 as her share of the remaining assets, of which $2,500 has been paid.

Thus, the Stipulation referred back to the parties' mediation agreement and the division of the parties' marital assets.

On June 25, 2010, Husband filed a motion to alter or amend the divorce decree, pursuant to Rules 59 and 52.02 of the Tennessee Rules of Civil Procedure. Asserting "newly discovered evidence," Husband's motion asked the trial court to amend the decree to designate Husband as the children's primary residential parent. Husband argued that Wife's actions in obtaining the *ex parte* order of protection in the General Sessions Court showed that Wife acted with intent to obstruct Husband's relationship with the parties' children, and that the trial court had erred in ignoring Wife's previous attempts to do so. On this basis, Husband argued that the trial court had erred in finding that Wife would facilitate and encourage a close and continuing relationship between Husband and the children. Not surprisingly, Wife opposed Husband's motion to amend the decree.

On July 29, 2010, the trial court held a hearing on Husband's motion to alter or amend. At the hearing, the trial court noted that the events on which Husband based his motion had occurred after the final hearing but before the trial court had entered its final decree. On this basis, the trial court denied Husband's motion to alter or amend. However, the trial court advised counsel for Husband that Husband's complaints about Wife's behavior could be raised in a petition to modify the final decree. After this, Husband then filed a notice of appeal, seeking to appeal the trial court's order on his motion to alter or amend, as well as several other decisions made by the trial court.

On June 15, 2011, this Court issued a decision on Husband's first appeal, determining that the order from which Husband had appealed was not final, in that the trial court had never entered a written order adjudicating Husband's March 26, 2010 petition to enforce the mediation agreement, *i.e.*, the Memorandum of Understanding. *Irvin*, 2011 WL 2436507, at *8. In its decision, the appellate court went on to describe other concerns about the trial court's orders, so as to avoid problems in the event that either party filed an appeal after remand. Specifically, the appellate court noted that the trial court's final decree was ambiguous in light of "all of the permutations and possible interpretations of the court's order, the [M]emorandum of [U]nderstanding, and the 'Stipulation,' and specifically how

these documents fit together to form the trial court's decision." *Id.* at *10-11. The appellate court also noted that the trial court's order did not include findings that were sufficient under Rule 52.01 of the Tennessee Rules of Civil Procedure. *Id.* at *11-12. In addition, the appellate court observed that, because the May 27, 2010 divorce decree was not a final order, the issues raised in Husband's motion to amend regarding Wife's misconduct could have been considered by the trial court in making its parenting decisions. For this reason, the appellate court stated that the trial court could consider these issues on remand with respect to the parties' parenting arrangement. Thus, this Court dismissed Husband's first appeal and remanded the cause for further proceedings.

On August 19, 2011, after the case was remanded, Husband filed a motion in the trial court pursuant to Rules 52.01 and 52.02 of the Tennessee Rules of Civil Procedure. The motion asked the trial court to enter findings of fact, to consider new evidence, and to enter a final decree of divorce. In light of the delay in entering a written divorce decree and the time spent on the first appeal, the hearing on Husband's Rule 52 motion was held almost two years after the initial divorce trial, on September 7 and 29, 2011. At the hearing, Husband asked the trial court to permit him to introduce evidence on a host of issues, including Wife's infidelity, the parties' parenting arrangement, rehabilitative alimony, and the division of marital assets. After considering this request, the trial court decided to consider only evidence of events that had occurred after the September 2009 hearing, and added that any evidence had to be "relevant, admissible evidence on an issue that is unresolved."[6] With that proviso, the trial court heard testimony from various witnesses.

At the post-remand hearing, Husband first submitted evidence that, contrary to her denials at the divorce trial, Wife had in fact committed adultery during the marriage. Husband sought to establish that Wife was not a credible witness, had lied to the trial court at the divorce trial, and that Wife, and not Husband, was at fault for the parties' divorce. As an offer of proof,[7] Husband introduced the testimony of Wife's paramour, David Wellette ("Mr. Wellette"). At the September 2009 divorce trial, Wife had flatly denied any infidelity, and specifically denied having a sexual relationship with Mr. Wellette, describing him as merely a "very good

---

[6]The trial court made clear its opinion that the appellate court's decision in the first appeal merely suggested, and did not mandate, a new hearing on remand on the designation of the primary residential parent. After reading the appellate court opinion, the trial judge stated: "[T]he comment that [the appellate court] made that that issue is within the bosom of this court is not a mandate. It sounds more like just commentary on the part of that court . . . . [I]f the appellate court wanted the trial court to make a finding of fact and conclusion of law with regard to who the primary residential parent should be, it should have told the trial court to do that."

[7]The trial court initially declined to permit Wellette's testimony, but then permitted Husband to submit it as an offer of proof.

friend." At the September 2011 post-remand hearing, however, Mr. Wellette testified that he and Wife began a sexual relationship in November or December of 2008, before Wife filed for divorce, and that it lasted for six to eight months. Their sexual encounters occurred, he said, at his house, at her house, and at a hotel. Asked whether the parties' children were ever present when he and Wife spent the night together, Mr. Wellette responded that the children "may have been in another room, but I wasn't sure."

Husband also submitted evidence on the parties' comparative fitness to be designated as the children's primary residential parent. He submitted evidence that, at the time of the post-remand hearing, Wife was romantically involved with Joseph Smith ("Mr. Smith"), whom Husband claimed was not a positive influence on the parties' children. Brenda Fauth ("Ms. Fauth"), Wife's next-door neighbor, friend, and former business partner, testified regarding her concerns about Wife's relationship with Mr. Smith. She recounted one incident in April 2010 in which Wife went out drinking with Mr. Smith, overslept the next morning, and ultimately did not take the children to school that day. Ms. Fauth said that Wife no longer allowed the parties' children to associate with Ms. Fauth's three children, because Ms. Fauth had cautioned Wife against a romantic relationship with Mr. Smith. In contrast, Ms. Fauth said that Husband encouraged a relationship between the parties' children and the Fauth children. Ms. Fauth and her husband, Jason Fauth, both testified that during the summer of 2011, while the children were with Husband in Alabama, it appeared that Wife did not live in the marital residence. During the remainder of the year, they said, Mr. Smith's vehicle was "[m]ore often than not" parked at Wife's home in the mornings, often three or four times a week.

Ms. Fauth testified that, during the pendency of the parties' divorce, she and Wife had co-owned a business called the Pottery Room, a paint-it-yourself ceramic studio. Ms. Fauth said that the business was started with $35,000 of Ms. Fauth's money. Shortly before the September 2009 divorce trial, however, Wife transferred her interest in the Pottery Room back to Ms. Fauth, for no consideration. Since the September 2009 divorce trial, Ms. Fauth testified, she had loaned Wife about $8,000 to pay the mortgage on the marital residence.

Mr. Smith testified at the hearing and corroborated Husband's assertion that he and Wife were romantically involved. He described himself as Wife's boyfriend, and he estimated that they had been together less than six months. Mr. Smith claimed that he had spent the night at Wife's house only once. Mr. Smith, 27 years old at the time of the hearing, testified that he had three children from two previous relationships; he claimed that he financially supported all three of his children. He said that he is "always with Mrs. Irvin and my child [from a previous marriage]. . . . [W]e always act as a family basically because we're trying to start a relationship." During the summer of 2011, Mr. Smith acknowledged, Wife spent the night with him sometimes, but he could not recall how many times. He admitted that in

September 2010, a charge of domestic abuse was filed against him by a previous girlfriend, and in November 2010, he was charged with driving while under the influence of alcohol. Mr. Smith asserted that the domestic abuse charge was dismissed and expunged from his record.[8]

Husband also testified at the hearing. In his testimony, Husband submitted a proposed division of the parties' marital assets and testified about the value of the property listed. Husband stated that, after he moved out of the marital residence in March 2009, but before the September 2009 divorce trial, he paid a total of $12,501 in mortgage payments. After the September 2009 trial, he noted, the trial court awarded Wife the marital residence and the accompanying debt. After that, Husband stated, Wife routinely fell behind in making the mortgage payments, and because he remained on the mortgage, her failure to pay timely adversely affected Husband's credit rating. He paid the mortgage in October 2009, and then again in February 2010; by that time, the mortgage was over 120 days in arrears. Based on Wife's history of not paying the mortgage, in his proposed division of marital assets, Husband requested that the marital home be sold. Husband's proposed division of marital assets also listed Wife's one-half interest in the Pottery Room as a $17,500 marital asset; Husband contended that Wife acquired her interest in the business during the parties' marriage, so it should be subject to equitable division.

Husband also testified about the aftermath of the trial court's award of rehabilitative alimony to Wife. In the September 2009 divorce trial, Wife had told the trial court that she intended to go back to school. Husband said that, pursuant to the trial court's order, he had been paying Wife $500 per month in rehabilitative alimony. However, she did not go back to school as she represented to the trial court. For that reason, Husband asked the trial court to reverse the award of rehabilitative alimony and to recharacterize the amount that Husband had already paid to Wife as her marital property.

Husband also testified that he should be designated the children's primary residential parent instead of Wife, because he would better facilitate the children's relationship with the other parent. As an exhibit at the hearing, Husband filed a transcript of the General Sessions Court hearing on Wife's *ex parte* request for an order of protection. Even after the General Sessions order of protection was dissolved, Husband asserted, Wife nevertheless filed the defunct order of protection with the children's school; Husband discovered this to his dismay about a year later when he went to the children's school to have lunch with them. Husband testified about Wife's more recent acts of obstruction, such as Wife being "periodically late at pickup and drop-off" and having the children attend other events during his parenting time when he visits them in Clarksville. When he spends parenting time with the children in

---

[8]The expunged records were not admitted into evidence at trial.

Clarksville, Husband complained, "there's always something they have to do. There's always some birthday party or some function that they must attend." Husband also claimed that Wife sometimes did not allow the children to talk to him on the telephone. Although he calls and leaves messages for the children, Husband stated, he is "lucky if [he] talk[s] to them once a week." In contrast, when the children are with Husband, he asks every day if they want to call their mother.

Husband also asserted that it was in the children's best interest to live primarily with him, because he understands what they need to be successful, and because he is the better disciplinarian. Husband explained that the children "need a father figure in their life that's a responsible adult that understands right and wrong . . . ." Husband told the trial court that he had chosen a school for the children in Alabama, and said that they have made friends there.

Finally, Wife testified at the post-remand hearing. She admitted that, at the September 2009 divorce trial, she had lied when she denied having had a romantic relationship with Mr. Wellette, and she conceded that she did in fact have an extramarital affair with him. Wife claimed that she was unsure when the relationship started, but asserted that it lasted for only three months. Nevertheless, she maintained that Husband was at fault for the demise of the parties' marriage. In light of Wife's admission, however, the proposed findings of fact and conclusions of law Wife submitted for the post-remand hearing indicated her position that neither party should be adjudged at fault for the demise of the marriage.

At the time of the post-remand hearing, Wife was working a temporary, hourly-wage job. Her gross income at the temporary job was $730.82 per month. Wife held a second job at a retail store, also hourly wage, earning $8.58 per hour. She was asked whether she had made any attempt to attend school since the September 2009 divorce trial. Wife responded that she had not obtained any further education, explaining that after the trial she "looked into it and realized at that time that I couldn't do it because of all the legal stuff that was continuing to go on." Wife testified that she was planning to return to real estate business at some point, so long as it did not interfere with her children's schedule. As to the Pottery Room business, Wife testified that she and Brenda Fauth had been equal partners in the business, and that Ms. Fauth had contributed $35,000 to start the business. Wife explained, however, that as of the time of the hearing, she had given her one-half interest back to Ms. Fauth.

Wife testified that after the 2009 divorce trial, the trial court's decision to designate her as the children's primary residential parent was the right decision. She said that, in her care, the children were thriving and doing well in school, and that they liked their classmates and teachers. She claimed that Husband did not exercise all of his allotted parenting time with

the children; he had given up his Fridays on the first weekend of every month if he had just previously seen the children. When he does travel to Clarksville, Wife stated, she allows Husband to spend extra time with the children. Wife denied Husband's assertion that she is late picking up the children on a regular basis, and said that she calls or texts Husband whenever she is going to be late.

Wife complained that Husband is not easy to work with, and that he does not give her sufficient notice when he plans to come into town to spend time with the children. Wife claimed that, when the children are with Husband, she does not often get to talk to the children, "maybe twice a week and that's it." On the other hand, when the children are at home with Wife, Husband speaks to them "about every other day" because Husband calls "sometimes twice a day."

In her testimony, Wife indicated that she intended to continue her relationship with Joseph Smith. She described him as a "good role model" for her children and "a good person." Wife claimed, "Now, my children are happier than they have been in years. And a lot of that has to do with the fact that Mr. Smith is a good person and he is a positive role model in their lives." She conceded, however, that the children's happiness was due in part to her telling the children that she was "going to do [her] best to have more of a positive relationship with their father . . . ."

Wife claimed that, as soon as she discovered that the General Sessions order of protection was still on file at the children's school, she had it removed from the children's school records. She asserted that Husband's claim that he was prevented from seeing the children at school was simply not true.

Wife was asked about her consistent claim that Husband posed a threat to her or the children. She responded, "I think he is going to snap if he doesn't get his way. . . . I believe he suffers from PTSD, and I do believe that, yes, he will snap one day. And what he will do once he snaps, I don't believe that it's going to be pretty." Wife explained that she nevertheless continues to foster Husband's relationship with the children because, while she continues to believe that he needs counseling for anger management, she also "believe[s] that . . . the good in him is going to come out." Wife admitted that, despite the fact that the Tennessee Department of Children's Services was notified of her allegations in the proceedings in General Sessions Court, the Department took no action against Husband. This concluded the evidence presented at the post-remand hearing.

At the conclusion of the post-remand hearing, the trial court issued a comprehensive oral ruling resolving most, but not all, of the issues presented. After Wife filed a motion noting that some issues had not been resolved, on October 31, 2011, the trial court issued additional

-15-

oral rulings on the remaining issues. Later that same day, the trial court entered a written Final Decree, memorializing all of its oral rulings.

In the Final Decree, the trial court declared Husband and Wife to be divorced pursuant to Tennessee Code Annotated § 36-4-129, assigning fault to neither party. The testimony of Wife's paramour, Mr. Wellette, was excluded and treated solely as an offer of proof. Attached to the order were worksheets detailing the trial court's division of the marital property; the order directed that the marital home be sold and that the proceeds be divided between the parties. The trial court rejected Husband's request for an award or adjustment in the division of the marital estate in the amount of mortgage payments and utility bills that he paid after he left the marital home, except that the trial court allowed him to recover the two payments made in October 2009 and February 2010.

The trial court did not significantly change the parenting arrangement set forth in the May 27, 2010 decree. Wife remained designated as the children's primary residential parent, although the Final Decree stated that Husband should "have as much time with the children as possible." The trial court attached a parenting plan to the Final Decree, allocating Husband 114 days of alternate residential parenting time. Husband was ordered to pay Wife $1,603 per month in child support based on his gross earning capacity of $9,065.34 per month.

In the Final Decree, the trial court also reaffirmed its award of rehabilitative alimony to Wife in the amount of $500 per month for 42 months, beginning November 2009. The trial court found that "Wife is economically disadvantaged," and that she "wants to attend and complete a post graduate degree to better improve her earning capacity on the open labor market . . . ." Finally, the trial court held that Wife's original attorney fees of $16,620 plus her post-remand attorney fees of $9,992.30 should be paid out of the marital estate.

Husband filed a motion for a stay of execution pending this appeal, which was granted by the trial court. Husband now appeals the trial court's Final Decree.

### ISSUES ON APPEAL AND STANDARD OF REVIEW

Husband raises several issues on appeal:

> 1. Whether the evidence preponderates against the trial court's finding that Wife was the parent who would better facilitate a relationship with Husband, and whether the children's best interest would be served by designating Wife the primary residential parent of the children?

-16-

2. Whether the trial court abused its discretion in not finding Wife at fault for the demise of the marriage'

3. Whether the trial court erred in awarding rehabilitative alimony to Wife?

4. Whether the trial court erred in its division of marital property by failing to consider the marital debt paid by Husband, and by failing to include the Pottery Room in the equation as a marital asset?

5. Whether the trial court abused its discretion by awarding attorney fees to Wife?

Generally, we review the trial court's findings of fact *de novo* upon the record, presuming those findings to be correct unless the evidence preponderates otherwise. *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. Ct. App. 1984). The trial court is accorded considerable deference on findings of fact that were based on witness credibility, because the trial court is in the best position to assess the witnesses. *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). Accordingly, we will not reverse the trial court's findings insofar as they are based on issues of witness credibility in the absence of clear and convincing evidence to the contrary. *Sullivan v. Sullivan*, 107 S.W.3d 507, 510 (Tenn. Ct. App. 2002). "Clear and convincing evidence is evidence that eliminates any substantial doubt and that produces in the fact-finder's mind a firm conviction as to the truth." *In re M.A.B.*, No. W2007-00453-COA-R3-PT, 2007 WL 2353158, at *2 (Tenn. Ct. App. Aug. 20, 2007). Issues of law must be reviewed *de novo*, with no deference given to the trial court's conclusions of law. *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000). We will identify the standard of review applicable to the specific issues in the context of our analysis below.

**ANALYSIS**

**Primary Residential Parent**

Husband first argues that the trial court erred in designating Wife as the primary residential parent of the parties' children. He contends that the evidence preponderates against the trial court's finding that Wife would be more likely to foster a close relationship between the children and him, emphasizing her continued baseless assertions that Husband has PTSD and a propensity for violence. He also asserts that Wife's "serial dishonesty" undermines the credibility of all of her testimony and reflects poorly on her fitness as a parent. In addition, he argues that Mother's relationship with Mr. Smith, who has a criminal history and three children from two previous relationships, is a bad influence on the children, contrary to the trial court's findings. Overall, Husband argues, the evidence preponderates against the trial

court's factual findings, and the facts that are supported by the record regarding the statutory factors point toward a finding that the children's best interest would be served by designating him as the children's primary residential parent.

In making parenting decisions, the court's paramount concern must be the welfare and best interest of the children; parenting decisions must not be made to reward or punish parents. *See Adelsperger v. Adelsperger*, 970 S.W.2d 482, 484-85 (Tenn. Ct. App. 1997). There are currently two different statutes setting out non-exclusive lists of factors for the trial court to apply when designating a primary residential parent and adopting a parenting plan consistent with the child's best interest. Tennessee Code Annotated § 36-6-106 sets forth factors for courts to consider in divorce cases or any other proceeding that requires it "to make a custody determination regarding a minor child."[9] Tennessee Code Annotated § 36-6-

---

[9]The relevant factors are as follows:

(1) The love, affection and emotional ties existing between the parents or caregivers and the child;

(2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that, where there is a finding, under subdivision (a)(8), of child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, by one (1) parent, and that a nonperpetrating parent or caregiver has relocated in order to flee the perpetrating parent, that the relocation shall not weigh against an award of custody;

(4) The stability of the family unit of the parents or caregivers;

(5) The mental and physical health of the parents or caregivers;

(6) The home, school and community record of the child;

(7)(A) The reasonable preference of the child, if twelve (12) years of age or older;

(B) The court may hear the preference of a younger child on request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that, where there are allegations that one (1) parent has committed child

(continued...)

404(b) sets forth factors that a trial court is to consider when determining the designation of a primary residential parent and the division of residential parenting time.[10]

---

[9](...continued)

abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected to the evidence. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and

(10) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order.

Tenn. Code Ann. § 36-6-106(a) (Supp. 2012).

[10]The statutory factors relevant to establishing a residential parenting schedule that is in the best interest of the child are:

(1) The parent's ability to instruct, inspire, and encourage the child to prepare for a life of service, and to compete successfully in the society that the child faces as an adult;

(2) The relative strength, nature, and stability of the child's relationship with each parent, including whether a parent has taken greater responsibility for performing parenting responsibilities relating to the daily needs of the child;

(3) The willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interests of the child;

(4) Willful refusal to attend a court-ordered parent education seminar may be considered by the court as evidence of that parent's lack of good faith in these proceedings;

(continued...)

*See Bryant v. Bryant*, No. M2007-02386-COA-R3-CV, 2008 WL 4254364, at *5-6 (Tenn. Ct. App. Sept. 16, 2008). The list of factors in Section 36-6-404(b) for the court to consider in determining a parenting plan and residential schedule are substantially similar to the best-interest factors set out in Section 36-6-106(a), and both statutes allow for consideration of any other factors the court deems relevant. *See Thompson v. Thompson*, No. M2011-02438-COA-R3-CV, 2012 WL 5266319, at *6 (Tenn. Ct. App. Oct. 24, 2012). "[I]n most cases,

---

[10](...continued)

> (5) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;
>
> (6) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;
>
> (7) The love, affection, and emotional ties existing between each parent and the child;
>
> (8) The emotional needs and developmental level of the child;
>
> (9) The character and physical and emotional fitness of each parent as it relates to each parent's ability to parent or the welfare of the child;
>
> (10) The child's interaction and interrelationships with siblings and with significant adults, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;
>
> (11) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;
>
> (12) Evidence of physical or emotional abuse to the child, to the other parent or to any other person;
>
> (13) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;
>
> (14) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;
>
> (15) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and
>
> (16) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-404(b) (2010).

the analysis and the result would be the same regardless of which set of factors is applied."
*Id.*

Trial courts have broad discretion to make decisions regarding parenting arrangements, including the designation of the primary residential parent. *Gaskill v. Gaskill*, 936 S.W.2d 626, 631(Tenn. Ct. App. 1996). Given the discretion involved and the fact that the decision often hinges on witness credibility, the appellate court reviews the trial court's ruling under the abuse of discretion standard. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001); *Chaffin v. Ellis*, 211 S.W.3d 264, 286 (Tenn. Ct. App. 2006). A trial court abuses its discretion only when it applies an incorrect legal standard or reaches a decision that is against logic or reasoning that causes an injustice to the complaining party. *Eldridge*, 42 S.W.3d at 85.

The trial court's decision on this issue is reflected in its two decrees — the initial decree entered on May 27, 2010, and the post-remand Final Decree entered on October 31, 2011. *See Cooper v. Tabb*, 347 S.W.3d 207, 221-22 (Tenn. Ct. App. 2010) (reviewing the trial court's decision as set out in both a non-final 2006 order and the final 2009 order). We note that, although much time passed between the two orders, the decision we review on appeal is an initial determination on the parties' parenting arrangement; it is not a decision on modification that would require a material change in circumstances. Therefore, we consider all of the evidence presented to the trial court, both at the September 2009 and September 2011 hearings, in reviewing the trial court's designation of Wife as the primary residential parent.

The statutes that govern parenting decisions in divorce cases provides explicitly that the trial court must consider "[t]he willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interests of the child." Tenn. Code Ann. § 36-6-404(b)(3); *see* § 36-6-106(a)(10) (listing the same factor as relevant in best-interest analysis);[11] *see also Bowers v. Bowers*, 956 S.W.2d 496, 498 (Tenn. Ct. App. 1997) (affirming award of primary custody to father where evidence showed that mother continually attempted to shut father out of child's life). This Court has repeatedly affirmed trial court decisions to change the designation of primary residential parent where, for example, the custodial parent has persisted in levying baseless accusations of child abuse against the alternate residential parent, so as to prevent sabotage of the children's relationship with the alternate residential

---

[11]The importance the legislature places on the continued involvement of both parents in the child's life is underscored by the recent amendment to Tenn. Code Ann.§ 36-6-106(a), directing the trial court to fashion a parenting arrangement that "permits both parents to enjoy the maximum participation possible," consistent with the child's best interest. Tenn. Code Ann. §36-6-106(a).

parent by the accusing parent. ***See Byars v. Young***, 327 S.W.3d 42, 49-50 (Tenn. Ct. App. 2010); ***see also Keisling v. Keisling***, 196 S.W.3d 703, 722 (Tenn. Ct. App. 2005) (finding that change in primary residential parent was necessitated by the mother's unfounded accusations of sexual abuse); ***Agee v. Agee***, No. W2007-00314-COA-R3-CV, 2008 WL 2065996, at *7-8 (Tenn. Ct. App. May 16, 2008) (same); ***George v. Mullican***, No. M2000-01106-COA-R3-CV, 2001 WL 673700, at *1 (Tenn. Ct. App. June 18, 2001) (same).

In its October 31, 2011 Final Decree, the trial court held: "Both parties have tried to facilitate a relationship with the other parent. The Court does not find that there has been an effort on the part of either of them to frustrate the other's relationship with the child or the children." Husband argues that the evidence preponderates against this finding and in favor of a finding that Wife acted to obstruct his relationship with the parties' children. We agree. It is undisputed that in March 2009, after the trial court had refused to grant Wife's request for exclusive use of the marital residence, Wife's father filed a Congressional Inquiry based on Wife's purported concerns, alleging that Husband was "abusive to the point of perhaps killing [Wife] and/or his children." These allegations resulted in Husband being removed from the marital home for 72 hours. He never returned to the marital home.[12] About a year later, after the trial court awarded Husband alternate residential parenting time with the children in Alabama during summer 2010, Wife went to the General Sessions Court and filed the *pro se* petition, and obtained a protective order *ex parte* by alleging that Husband had choked the parties' son and had sexually abused their daughter. These allegations proved to be baseless, and the General Sessions Court told Wife in open court that she had misled the court and that she was "trying to use these children against [Husband]."[13] Undeterred by this setback, after Husband filed a motion in the trial court to enforce his summer visitation, Wife continued to insist that Husband was suffering from PTSD and would hurt her, the children, and "others around him." Long after the *ex parte* General Sessions protective order had been dismissed, it remained in the children's school records until Husband attempted to visit them for lunch at their school. Wife has never produced evidence to support her continued allegations against Husband, and the trial court below did not credit them.

Respectfully, and with due deference to the trial court's ability to see the witnesses and judge their demeanor, it is difficult to see how Wife's undisputed actions can be viewed as anything other than calculated attempts to obstruct and interfere with Husband's relationship with his children. Although the trial court below correctly noted that it was technically not bound by the findings of the General Sessions judge, the undisputed facts can lead to no conclusion

---

[12]Coincidentally, the accusations against Husband by Wife and her father were made around the same time Wife now admits she was having an affair with Mr. Wellette.

[13]The Circuit Court discounted this finding of the General Sessions Court.

other than the conclusion reached by the General Sessions judge. Wife's actions during this time period constitute egregious, unwarranted interference with the children's relationship with their father. If Wife's testimony at the post-remand hearing is any indication, she continues to believe that Husband suffers from PTSD and is a threat to their children, despite the lack of any evidence to support this claimed belief. Given her blatant obstruction in the past, this is cause for continued concern. We agree with Husband that the evidence preponderates against the trial court's finding that there had been no effort by Wife to interfere with the children's relationship with Husband, and that the parties are equally willing to facilitate the children's relationship with the other parent.

Husband also argues that Wife's "serial dishonesty" and her relationship with Mr. Smith are other factors that favor designating him as the primary residential parent. Certainly Wife's admitted false testimony in the divorce trial about her relationship with Mr. Wellette is disturbing and would be considered in the trial court's assessment of her overall truthfulness. The trial court, however, is charged with the responsibility for making credibility determinations about all of the witnesses at trial. The trial court may choose to discredit the testimony of a witness or party on some issues and credit the testimony of the same witness or party on other issues. Thus, Wife's admitted untruthfulness about her infidelity does not amount to the clear and convincing evidence required for an appellate court to reverse the trial court's decision to credit Wife's testimony as it related to parenting and the children's welfare.

Regarding Wife's relationship with Mr. Smith, the trial court stated in its oral ruling after the post-remand hearing that Mr. Smith was not "a person whose character or behavior would be detrimental to the children" based on his "demeanor, his truthfulness, [and] his veracity or lack thereof." In the written October 31, 2011 order, the trial court found specifically: "The Court does not find anything about Mr. Joseph Smith that created a concern for this Court that today he is of such character and that he behaves in such a way that the children are detrimentally affected by his presence."

The evidence on this issue was conflicting. Husband presented undisputed evidence that Mr. Smith had criminal episodes in his background, and that he has three children from two previous relationships. Wife, on the other hand, testified that Mr. Smith supported his children, was a good person, and was a good influence on the parties' children. No evidence was presented to show that Mr. Smith was abusive to Wife or to the children, and no evidence was presented to show that Mr. Smith's presence caused difficulty in the relationship between Husband and his children. Giving due deference to the trial court's credibility determinations, we cannot find that the evidence preponderates against the trial court's finding that Mr. Smith's relationship with Wife was not detrimental to the parties' children.

Given all of the relevant factors, Husband argues vigorously that the trial court erred in designating Wife as the children's primary residential parent. The trial court considered all relevant factors and based its decision on the evidence presented at the first trial, including the guardian ad litem report and the children's psychological evaluations, as well as the testimony that was introduced at the post-remand hearing two years later. After considering all of the evidence, the trial court found that, while most of the statutory factors did not favor one parent over the other, Wife had taken a greater parental responsibility for the children's daily needs, and the children were in a stable, satisfactory environment with Wife, "not only since birth, but when they were with both parents, but in the last two years they've been with her primarily." The undisputed evidence at the September 2009 trial showed that the children were happy and thriving while living with Wife in Clarksville, and the evidence presented at the September 2011 hearing showed nothing different. This is a significant factor.

Moreover, even as to the parties' relative willingness to facilitate the children's relationship with the other parent, on which we held that the trial court's finding was not supported by the evidence, we note that the evidence shows that Wife's active interference with Husband's relationship with the parties' children tapered off after the May 27, 2010 order. Husband testified that, after that parenting plan went into effect, Wife's alleged acts of interference consisted of hindering his telephone visitation with the children, being frequently late to their parenting time exchanges, and filling his parenting weekends with scheduled activities for the children. Though Wife continued to espouse the unsupported belief that Husband suffered from PTSD and posed some danger to the children, there was no evidence to suggest that Wife acted on that belief by preventing Husband from exercising his parenting time with the children. For her part, Wife testified she was making an effort to improve her relationship with Husband for the benefit of the children, and that Husband was also late for exchanges on occasion. The trial court credited both Husband's and Wife's testimony to some extent, and on appeal we are required to defer to the trial court's credibility determinations absent clear and convincing evidence to the contrary.

Our decision on the trial court's designation of primary residential parent must be driven by our high standard of review on appeal. Given Wife's flagrant, repeated acts of interference with the children's relationship with Husband before May 2010, our decision on this issue at the trial-court level may very well have been different from the decision made by the trial court below. On appeal, however, we are not permitted to substitute our judgement for that of the trial judge. We may reverse the trial court's designation of primary residential parent only if it amounts to an abuse of the trial court's discretion. Wife's behavior makes this a close question. However, given the weight rightfully accorded to the factor of continuity for the children and their stability in Wife's home, and given the fact that Wife did not continue actively interfering with the children's relationship with their father, we conclude that the

trial court's designation of Wife as the children's primary residential parent was not an abuse of the trial court's discretion. Therefore, we affirm the trial court's decision on this issue.

## Fault

Husband next challenges the trial court's decision to declare the parties to be divorced without assigning fault to either party pursuant to Tennessee Code Annotated § 36-4-129. That statute provides:

> (b) The court may, upon stipulation to or proof of any ground of divorce pursuant to § 36-4-101, grant a divorce to the party who was less at fault or, if either or both parties are entitled to a divorce or if a divorce is to be granted on the grounds of irreconcilable differences, declare the parties to be divorced, rather than awarding a divorce to either party alone.

Tenn. Ct. App. § 36-4-129(b) (2010).

In the May 27, 2010 order after the divorce trial, the trial court initially granted the divorce to Wife based on Husband's inappropriate marital conduct. *See* Tenn. Code Ann. § 36-4-101(11) (2010). In its oral ruling, the trial court explained: "Mr. Irvin was responsible for an atmosphere of criticism . . .; second guessing; verbal insults; and unwarranted control. And over the course of time this adversely affected the marriage and because of that, the marriage has reached a point where it cannot be salvaged." In its May 27, 2010 written order, the trial court stated that, "in weighing [Husband's] conduct against that alleged of the Wife, the Court finds that his conduct preceded and was more egregious and damaging to the marriage . . . ."

Later, after the September 29, 2011 post-remand hearing, the trial court reaffirmed its earlier finding that Husband had engaged in inappropriate marital conduct during the parties' marriage. Although the trial court found no evidence in the record of physical abuse, it stated that Wife's "testimony was replete with her insistence that over the course of the marriage, he was controlling; that he was verbally insulting and abusive; that he was critical of what he said she did; that he second-guessed her decisions with regard to household affairs and parenting." The trial court addressed Wife's testimony acknowledging her untruthfulness about her adulterous relationship with Mr. Wellette, noting that Wife "acknowledged that she lied to the Court at the final hearing." The trial court determined that Wife's infidelity constituted fault on her part, but also found that by the time this occurred, the marriage had already deteriorated because of Husband's conduct:

> [Wife's] relationship with Mr. [Wellette], even if you consider it to have
> started when he says it started, this marriage was — it was over. Did her
> relationship help things? Of course not. Could they have salvaged it if it had
> not happened? I certainly don't believe so. Was it the cause of the dissolution
> of the marriage? No. The marriage had dissolved at that point in time. It just
> hadn't been legally adjudicated.

Thus, in light of Wife's admission, the trial court altered its previous ruling and declared the parties to be divorced under the statute, assigning no fault to either party.[14]

On appeal, Husband argues that the evidence preponderates against the trial court's ruling, and that fault should have been assigned to Wife based on her false testimony and her subsequent admission about her extramarital affair. In support of his position, Husband cites *Jekot v. Jekot*, 232 S.W.3d 744 (Tenn. Ct. App. 2007). In *Jekot*, the trial court granted the wife a divorce based on the grounds of the husband's adultery. On appeal, the husband argued that the trial court should have simply declared the parties divorced pursuant to Section 36-4-129(b), because the evidence showed that the marriage had deteriorated long before his affair began, and because the wife had also engaged in an extramarital affair fifteen years before the divorce. *Jekot*, 232 S.W.3d at 753-54. The appellate court rejected the husband's argument, finding that it was within the trial court's discretion to grant the wife a divorce under the circumstances, "even where there is evidence that both parties engaged in inappropriate marital conduct." *Id.* at 754. Husband in the instant case argues that "[t]his Court should follow the holding in *Jekot*, and find that [Wife] was at fault for the demise of the marriage."

Respectfully, Husband misconstrues the appellate court's holding in *Jekot*. In *Jekot*, the appellate court took care to apply the abuse of discretion standard to the trial court's decision in a situation where both parties had established that the other had engaged in inappropriate marital conduct:

> Pursuant to T.C.A. § 36-4-129(b), a trial court is given the discretion to grant
> a divorce to either or both of the parties . . . .
>
> . . .

---

[14]The trial court's October 31, 2011 order states simply: The Court declares that the Wife and Husband are divorced with no fault attributed to either party . . . ." The reasoning behind this decision was explained orally at the post-remand hearings on September 29, 2011, and October 31, 2011.

In *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001), the Tennessee Supreme Court stated as follows regarding the abuse of discretion standard:

> Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to propriety of the decision made." *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000); *State v. Gilliland*, 22 S.W.3d 266, 273 (Tenn. 2000). A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999). The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court. *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998).
>
> An abuse of discretion occurs when the lower court's decision is without a basis in law or fact and is, therefore, arbitrary, illogical, or unconscionable. *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 191 (Tenn. 2000).

*Id.* at 753-54. Applying this standard, the *Jekot* Court reasoned that, even though the husband's factual allegations — that the marriage had been deteriorating and that the wife had also had an affair — were supported by the evidence, the trial court's decision to grant the wife the divorce based on the husband's conduct was not against logic or reasoning or without basis in law. Instead, the appellate court noted that the wife's affair was remote in time, and that "it might reasonably be argued [that the husband's infidelity] substantially decreased the probability of future reconciliation." *Id.* at 754. Therefore, the appellate court held that the trial court did not abuse its discretion in finding the husband to be at fault and in granting a divorce to the wife.

In the same way, we must apply the abuse of discretion standard to the trial court's decision to declare the parties divorced, without assigning fault to either party. Fault for the demise of a marriage can take many forms; adultery is only one of them. Husband does not argue on appeal that the evidence was insufficient to support a finding that he committed the inappropriate marital conduct described by the trial court. He argues instead that fault should have been assigned to Wife because her misconduct was the more egregious. We cannot agree that the decision Husband urges on appeal was the *only* logical conclusion to be reached from the facts presented to the trial court. Based on our review of the record, we hold that the trial court's decision was supported by the evidence and well within the trial

court's discretion. Accordingly, we affirm the trial court's decision to declare the parties divorced pursuant to Section 36-4-129(b).

## Rehabilitative Alimony

Husband next argues that the trial court erred in awarding rehabilitative alimony to Wife. The trial court has wide latitude in making an award of alimony. *Owens v. Owens*, 241 S.W.3d 478, 490 (Tenn. Ct. App. 2007). An award of alimony depends on the circumstances of each case; the recipient spouse's need and the obligor spouse's ability to pay are the primary considerations. *Burlew v. Burlew*, 40 S.W.3d 465, 472 (Tenn. 2001). When determining the type and amount of alimony to be awarded, the trial court must balance several factors, including those enumerated in Section 36-5-121(i).[15] The type and amount

---

[15]That statute provides:

> (i) In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:
>
> (1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
>
> (2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;
>
> (3) The duration of the marriage;
>
> (4) The age and mental condition of each party;
>
> (5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
>
> (6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;
>
> (7) The separate assets of each party, both real and personal, tangible and intangible;
>
> (8) The provisions made with regard to the marital property, as defined in § 36-4-121;
>
> (9) The standard of living of the parties established during the marriage;
>
> (10) The extent to which each party has made such tangible and intangible contributions to

(continued...)

of an alimony award remain largely within the discretion of the trial court. *Id.* at 470. "[R]ehabilitative alimony is intended to assist an economically disadvantaged spouse in acquiring additional education or training which will enable the spouse to achieve a standard of living comparable to the standard of living that existed during the marriage or the post-divorce standard of living expected to be available to the other spouse. *See* Tenn. Code Ann. § 36-5-121(e)(1). " *Gonseweski v. Gonseweski*, 350 S.W.3d 99, 108 (Tenn. 2011). A trial court's award of alimony is reviewed on appeal under an abuse of discretion standard. *Berlew*, 40 S.W.3d at 472.

In the May 27, 2010 decree, based on the evidence presented at the divorce trial, the trial court found that Wife was economically disadvantaged as compared to Husband, and that "Wife wants to attend and complete a post graduate degree to better improve[ ] her earning capacity on the open labor market and the Court finds that this plan is appropriate." Premised on this factual finding, the trial court granted Wife rehabilitative alimony of $500 per month for 42 months beginning November 1, 2009.

At the October 31, 2011 post-remand hearing, Husband argued that Wife should not receive rehabilitative alimony because Wife admitted in her testimony that she had not used the money that she received in rehabilitative alimony to rehabilitate herself, but had instead simply kept the money for herself.[16] Wife's testimony at the post-remand hearing indicated that she no longer intended to rehabilitate herself via education, training or other means. Nevertheless, the trial court refused to revisit the issue of alimony because Husband did not raise it as an issue in the first appeal:

---

[15](...continued)
> the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;
>
> (11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and
>
> (12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121(i) (Supp. 2012).

[16]In her appellate brief, Wife notes that Husband did not raise the rehabilitative alimony issue in his Rule 52 motion for additional findings. Husband's argument was made in open court, however, and Wife did not object to the trial court's consideration of this issue at the post-remand hearing.

[Counsel for Husband]: The last ruling in this court, Your Honor, was that you entered a final decree for rehabilitative alimony to the wife in the amount of $500 per month for 42 months.

[Court]: Was that raised on appeal?

[Counsel for Husband]: It was not raised on appeal but it didn't need to be because there was no final order.

[Court]: Then I am not changing my previous ruling. It will be in the final order as ruled upon.

In the October 31, 2011 Final Decree, the trial court adhered to the ruling in the first decree, awarding Wife $500 per month for 42 months because she is an economically disadvantaged spouse that intended "to attend and complete a post graduate degree . . . ."

On appeal, Husband argues that Wife should have been denied alimony based solely on her fault in the demise of the marriage. *See* Tenn. Code Ann. § 36-5-121(i)(11). Even absent a finding of fault, Husband claims, the evidence preponderates against the trial court's finding that Wife needed rehabilitative alimony to further her education, because Wife admitted in the post-remand hearing that she no longer has plans to seek further education or training. Husband claims that rehabilitative alimony is not justified for someone who does not intend to rehabilitate herself. In addition, Husband claims, Wife did not demonstrate a need for rehabilitative alimony where she did not put on proof of such a need at trial. Thus, Husband urges us to reverse the trial court's award of rehabilitative alimony and to give him credit for the alimony he has wrongly paid to Wife. At the least, Husband maintains, Wife's alimony award should be discontinued.

We have determined that the trial court did not err in declaring the parties divorced and in finding that the parties were both at fault for the demise of the marriage. In light of this, although fault is a factor that may be considered in awarding alimony, we will not reverse the award of rehabilitative alimony based solely on Wife's portion of the shared fault.

We must hold, however, that the trial court erred in refusing to consider the issue of rehabilitative alimony based on procedural grounds. As we concluded in the first appeal, the May 27, 2010 order was not final. Thus, as noted by the trial court below, the entire case remained in the bosom of the trial court, subject to revision by the trial court. *See Irvin*, 2011 WL 2436507, at *13 n.5. Thus, the post-remand award of rehabilitative alimony is an initial award, and we review it as such. Moreover, Husband's argument on the award of rehabilitative alimony was not based on the evidence that was presented in the 2009 divorce

-30-

trial. Rather, it was based on events as they occurred after the divorce trial, so he could not have raised the issue as it is currently presented in the first appeal. This Court has recognized "the unusual predicament presented by the inordinate amount of time" that can pass between the entry of a trial court's non-final orders over the course of one case. *Hawkins v. O'Brien*, No. M2008-02289-COA-R3-CV, 2009 WL 2058802, at *4-5 (Tenn. Ct. App. July 15, 2009) (citing *Gorski v. Ragains*, No. 01A01-9710-GS-00597, 1999 WL 511451, at *4 (Tenn. Ct. App. 1999)). As stated by the *Gorski* court, "we cannot ignore the fact that all the parties' circumstances are not the same as they were when they were last before the trial court." *Gorski*, 1999 WL 5114514, at *4. Thus, we find at the outset that the trial court erred in holding that it was somehow procedurally barred from considering Husband's argument on the award of rehabilitative alimony.

We must now address whether the evidence preponderates against the factual finding that Wife intended to seek further education, the finding upon which the award of rehabilitative alimony was premised. In the 2009 divorce trial, Wife testified that she intended to pursue a graduate degree. Wife explained that she had spoken to a college representative and was planning to complete her degree in three years. She also testified that, if the trial court would grant her rehabilitative alimony for that purpose, she would also sell real estate to supplement her income. Husband had no evidence to rebut Wife's testimony on her stated intent to take actions in the future to rehabilitate herself. Thus, if only the evidence at the 2009 divorce trial were considered, the trial court's factual finding as to Wife's need for rehabilitative alimony for her plan to rehabilitate herself would be supported by the evidence.

However, a different story emerged after the case was remanded to the trial court. At the September 2011 post-remand hearing, Wife testified that she had in fact made no attempt to obtain further education or training since the 2009 hearing. Her stated reason was that she "realized at that time that I couldn't do it because of all the legal stuff that was continuing to go on."[17] Wife said only that she might pursue a career in real estate, for which she needed no additional education or training. This is directly contrary to the trial court's October 31, 2011 factual finding, after remand, that Wife "wants to attend and complete a post graduate degree to better improve[ ] her earning capacity . . . ." In light of Wife's testimony in the post-remand hearing, we must conclude that the overall evidence before the trial court preponderates against this factual finding. As this was the stated basis for the trial court's

_____

[17]In her appellate brief, Wife argues that, because of the stay that was imposed by this Court and because she has "yet to receive one dime from the marital estate since the initial divorce," Wife could not possibly have afforded graduate school. First, Husband paid the monthly alimony to Wife, and this money was intended to fund her post-graduate education. In addition, Wife did not testify that lack of money was the reason that she did not attend graduate school; rather, she indicated that the time constraints involved in this lawsuit prevented her from going to school, and that she intended to get back into the real estate business. Therefore, this argument is without merit.

award of rehabilitative alimony to Wife, we must also conclude that the trial court abused its discretion in failing to reverse its initial ruling on Wife's request for rehabilitative alimony. As we have indicated, rehabilitative alimony is intended to assist an economically disadvantaged spouse "in acquiring additional education or training . . . ." ***Gonseweski***, 350 S.W.3d at 108. Considering the evidence presented at the divorce trial as well as the evidence submitted post-remand, we can only conclude that Wife does not intend to pursue her initial stated plan of obtaining additional educational training. Under these circumstances, the evidence in the record does not support the award of rehabilitative alimony.

We note, however, that the trial court found that Wife is economically disadvantaged as compared to Husband, and that this finding is supported in the record. Moreover, the evidence in the record does not indicate that Wife was untruthful in her testimony in the 2009 divorce trial as to her intent to pursue further education, only that she did not follow through on her original plan. An outright reversal of the award of rehabilitative alimony would require Wife to repay all of the rehabilitative alimony she has received. From our review of the record, this would work a real hardship on Wife. In this unusual circumstance, we exercise our discretion to modify the trial court's award of rehabilitative alimony rather than reverse it *in toto*. We modify the award of rehabilitative alimony to terminate it as of the date of Husband's request that it be terminated, October 31, 2011. ***See Honeycutt v. Honeycutt***, 152 S.W.3d 556, 566 (Tenn. Ct. App. 2003) (holding that the wife was no longer entitled to alimony because she was cohabiting with another male, and her alimony refund to the husband was measured from the time the husband filed his petition for modification).

Therefore, Husband's alimony obligation is terminated effective October 31, 2011, and we remand the case to trial court to determine of the amount of the refund of alimony that is due to Husband.

## Division of Marital Property

The trial court must consider all relevant factors in its distribution of marital property, including those listed in Tennessee Code Annotated § 36-4-121(c).[18] In dividing the marital

---

[18]The factors set out in Tenn. Code Ann. § 36-4-121(c) are:

(1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(continued...)

property, "[t]he trial court is empowered to do what is reasonable under the circumstances and has broad discretion in the equitable division of the marital estate." *Keyt v. Keyt*, 244 S.W.3d 321, 328 (Tenn. 2007) (citing *Flannary v. Flannary*, 121 S.W.3d 647, 650 (Tenn. 2003)). Therefore, we review the trial court's division of marital property for an abuse of discretion. As we have stated, a trial court has abused its discretion when it has applied an incorrect legal standard or reached a decision that is against logic or reasoning that causes an injustice to the complaining party. *Eldridge*, 42 S.W.3d at 85.

Husband argues that the trial court erred in not giving him credit in the division of marital property for $12,501 in mortgage payments and $4,892 in utilities that he paid between March 2009 and the September 2009 hearing, at which time the trial court ordered Wife to make those payments. Although Husband was no longer living in the marital home, it appears that Husband made these payments voluntarily. At the time, Wife and children were living in the marital home, and Wife had no access to the bank accounts that held the marital funds out of which the house and utility payments could be made. Husband made the *pendente lite* payments for several reasons: to maintain the *status quo,* to benefit the parties' children living in the home with Wife, and to protect his credit since he remained on the mortgage.

_____

[18](...continued)

> (3) The tangible or intangible contributions by one (1) party to the education, training or increased earning power of the other party;

> (4) The relative ability of each party for future acquisitions of capital assets and income;

> (5) The contribution of each party to the acquisition, preservation, appreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled his or her role;

> (6) The value of the separate property of each party;

> (7) The estate of each party at the time of the marriage;

> (8) The economic circumstances of each party at the time the division of property is to become effective;

> (9) The tax consequences to each party; and

> (10) Such other factors as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-4-121(c) (Supp. 2012).

We find that the trial court did not abuse its discretion in failing to give Husband credit for these payments. Voluntary payments made to Wife during the pendency of the proceedings are not listed as a factor that the trial court must consider in making an equitable division of marital property. *See Stolze v. Stolze*, M2010-00818-COA-R3-CV, 2011 WL 1303382, at *4 (Tenn. Ct. App. Apr. 5, 2011). Also, the payments were made with marital funds, which belonged to both Husband and Wife. For these reasons, and in light of the overall property division, we cannot conclude that the trial court abused its discretion in failing to give Husband credit for these payments in the division of the marital estate.

Husband also argues that the trial court erred in failing to categorize the Pottery Room business owned by Wife and Ms. Fauth as marital property subject to equitable division. The evidence on this issue is undisputed. Ms. Fauth contributed $35,000 to start up the Pottery Room business, and it was owned by a limited liability company in which Ms. Fauth and Wife were members. Wife contributed no money to the business, and little evidence was presented to show Ms. Fauth's intent when she included Wife in her business venture. By the time of the September 2011 post-remand hearing, Wife had given her half of the business back to Ms. Fauth, and she did not receive any money in return for this interest. Husband presented no evidence to show that the interest Wife transferred back to Ms. Fauth had any monetary value.[19] Therefore, we cannot conclude that the trial court erred in omitting the Pottery Room business from its calculations on the division of the parties' marital property.

Wife also raises two issues on appeal regarding the trial court's division of the marital estate.[20] First, she argues that the trial court erred in giving Husband credit in the marital property division for the mortgage payments he made in October 2009 and February 2010. It appears that this decision was based on the fact that the trial court's September 29, 2009 oral ruling, which incorporated the parties' mediation agreement, required Wife to be responsible for the mortgage payments. In other words, it appears that the trial court gave

---

[19]Husband did not argue that Wife had dissipated this marital asset, or that she fraudulently transferred her interest back to Ms. Fauth for an improper purpose.

[20]In her appellate brief, Wife's Statement of the Issues states simply: "The trial court made two errors in its division of the marital estate." In the Argument section of her brief, she identifies the two ways in which she alleges that the trial court erred. The Tennessee Supreme Court has recently noted that, "appellate courts prefer to know immediately what questions they are supposed to answer," and that "[t]he issues should be framed as specifically as the nature of the error will permit in order to avoid any potential risk of waiver." *Hodge v. Craig*, No. M2009-00930-SC-R11-CV, 2012 WL 4486315, at *6 (Tenn. Oct. 1, 2012). The *Hodge* Court also noted that "an issue may be deemed waived when it is argued in the brief but is not designated as an issue in accordance with Tenn. R. App. P. 27(a)(4)." *Id.* Wife's Statement of the Issues is inadequate because it does not identify the "two errors" she seeks to assert. Nevertheless, based on the circumstances of this case, we exercise our discretion to address the issues raised by Wife in the Argument portion of her appellate brief.

Husband credit for those two payments because they were made on behalf of Wife. Wife argues that this was erroneous, because when Husband made the two mortgage payments, the trial court had not issued a written ruling, and its oral ruling was allegedly not enforceable. Therefore, in Wife's view, Husband was not satisfying Wife's obligation at all; he simply made two more voluntary mortgage payments, and they should be treated the same as the pre-hearing mortgage payments made by Husband.

Wife makes much of the fact that the trial court's September 2009 oral ruling requiring her to make mortgage payments was unenforceable because it was not incorporated into a written ruling until May 27, 2010. Indeed, this Court has stated: "A court speaks only through its written judgments, duly entered upon its minutes. Therefore, no oral pronouncement is of any effect unless and until made a part of a written judgment duly entered." *Sparkle Laundry & Cleaners, Inc. v. Kelton*, 595 S.W.2d 88, 93 (Tenn. Ct. App. 1979). This, however, does not make the trial court's oral rulings a nullity. The trial court's oral pronouncement was a small part of the trial court's overall reasoning in its division of the marital estate. Under these circumstances, we decline to hold that the trial court abused its discretion in giving Husband credit for two house payments made after the September 2009 oral ruling.

Wife also argues that the trial court erred in awarding Husband the entire amount of the equity in the 2008 Chevrolet Corvette.[21] The relevant facts are undisputed. Husband bought the Corvette in December 2009, after the trial court's September 2009 oral ruling. By the time of the September 2011 post-remand hearing, Husband had made almost two years of payments on the vehicle. Wife claims that Husband made payments on the Corvette out of marital funds, so she should have been awarded half of the value of the Corvette in the division of marital property.

This argument is likewise without merit. We do not consider the trial court's division of the marital property piecemeal, we consider the entirety of the trial court's distribution of marital property and debt. This car was used by Husband for his personal use, and he made all of the payments on the vehicle during the pendency of the litigation. Considering the overall distribution of property to the parties, we cannot find that the trial court's decision to award Husband the entire interest in the Corvette was an abuse of its discretion.

---

[21]It is unclear whether Wife objected to this finding in the trial court. We address it, however, out of an abundance of caution.

## Attorney Fees

Husband argues that the trial court erred in awarding Wife attorney fees in this case. An award of attorney fees in divorce litigation is alimony *in solido*. **Herrera v. Herrera**, 944 S.W.2d 379, 390 (Tenn. Ct. App. 1996). Thus, in contemplating such an award, the trial court must again consider the relevant factors applicable to an award of alimony found in Tennessee Code Annotated § 36-5-121(i). The trial court's award of attorney fees is within its sound discretion, and it will not be disturbed on appeal absent an abuse of that discretion. **Langschmidt v. Langschmidt**, 81 S.W.3d 741, 751 (Tenn. 2002).

In this case, the trial court ordered that Wife's attorney fees be paid out of the marital estate. The trial court appears to have credited Wife's argument that, at the end of the proceedings, Husband had paid all of his attorney fees out of marital funds. Based on this fact, and also based on Wife's need and Husband's ability to pay, the trial court allowed Wife the same access to the marital coffers to pay her attorney fees. We find that this constituted an award of alimony *in solido* for Wife.

On appeal, Husband argues that the trial court's decision to allow Wife's attorney fees to be paid out of marital funds constituted an abuse of its discretion, because Wife repeatedly tried to circumvent the authority of the trial court by her use of military channels to have Husband removed from the home, and by going to the General Sessions Court to seek an unwarranted order of protection. In addition, Husband argues, Wife filed unsuccessful and wasteful motions for criminal contempt, and she lied to the trial court at the first hearing about her adultery. Based on Wife's egregious litigation strategies, Husband argues, the trial court should have denied Wife an award of any attorney fees whatsoever. On appeal, he argues that the entire attorney fee award should be reversed.

As we have stated, the trial court's determination that Wife's attorney fees should be paid is a matter that falls within the trial court's sound discretion. In making its decision on this issue, the trial court must balance a variety of factors. From our review of the record as a whole, under the circumstances of this case, we find that the trial court did not abuse its discretion in its award of attorney fees to Wife.

## Appellate Attorney Fees

Wife argues on appeal that Husband's appeal is frivolous, and that she should be awarded her attorney fees incurred on appeal pursuant to Tennessee Code Annotated § 27-1-122.[22]

_____

[22]That statute provided:

(continued...)

A frivolous appeal is one that is devoid of merit or has little prospect for success. ***Robinson v. Currey***, 153 S.W.3d 32, 42 (Tenn. Ct. App. 2004). The decision to award damages for the filing of a frivolous appeal rests in the sole discretion of this Court. ***Whalum v. Marshall***, 224 S.W.3d 169, 180-81 (Tenn. Ct. App. 2006) (citing ***Banks v. St. Francis Hosp.***, 697 S.W.2d 340, 343 (Tenn. 1985)). Husband presented serious issues on appeal, and his appeal was neither frivolous nor taken solely for purposes of delay. Therefore, we deny Wife's request for attorney fees on appeal.

## CONCLUSION

The decision of the trial court is modified in part, affirmed as modified, and remanded for further proceedings consistent with this Opinion. Costs on appeal are to be taxed one-half to Defendant/Appellant Ernest J. Irvin, II, and his surety, and one-half to Plaintiff/Appellee Una P. Irvin, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE

---

[22](...continued)

> When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include, but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

Tenn. Code Ann. § 27-1-122 (2000).